## THE MONARCH OF NASSAU.

### SAWYER et al. v. M. LEVIN & CO., Inc.

### No. 11510.

Circuit Court of Appeals, Fifth Circuit.

April 26, 1946.

Rehearing Denied May 15, 1946.

Lewis H. Fogle, Jr., and William Kirtley, both of Miami, Fla., for appellants.

Robert H. Givens, Jr., and Cody Fowler, both of Miami, Fla., for appellees.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

The British owned Steamship Monarch of Nassau, for which Carl Sawyer was

agent at Miami, Florida, was libeled for the loss of a cargo of bananas and claimed for the owners by the agent. The libel charged in brief that she was chartered by libelants, M. Levin and Co. Inc., for an indefinite number of voyages to carry bananas from ports in Haiti to Miami, there being an implied warranty of seaworthiness; that on March 26, 1944, having aboard 7,370 stems of bananas, she grounded on rocks near the port of loading in Haiti due to unseaworthiness and faulty navigation, whereby 1,407 stems of bananas had to be jettisoned, and on refloating she carried the remaining cargo to the port of loading and delivered it to the sellers, Standard Fruit and Steamship Company, which sold it for $11.15 less than the expense of handling. A total loss of $11,263, the value of the bananas in Philadelphia, was claimed. The answer admitted the charter as exhibited, and the stranding, but denied that the stranding was due to unseaworthiness or faulty navigation, and specially pleaded as a defense Par. 5 of the charter. The district judge held the vessel to be a private carrier and not a common carrier and that the Harter Act does not apply; that Pars. 5 and 9 of the charter do not govern; that the stranding was due to negligence, and less clearly to a fault of the compass, and gave decree for the value of the bananas at the place of their shipment, plus the deficit in handling and selling them, a total of $5,543. The claimant appeals, for himself and the vessel.

Only three witnesses were heard, the President of the libellant, the Chief Engineer of the vessel, and her agent. The master, who had served as such for five or six years, and was discharged on account of the stranding, did not testify. The President testifies that when the vessel, after repairs were completed, put into port at Miami on May 25, he went aboard and the master told him that "the boy" was on watch at the time of the stranding and he made a mistake, and the compass went wrong, and had been fixed at Port au Prince where the vessel was repaired in dry dock; and that the master had repeated this statement about two weeks before the trial. Objection was made to these statements as hearsay. What the master said after his discharge is hearsay and inadmissible. No agent may bind his principal by his words after the relationship is ended. 31 C.J.S., Evidence, § 347. What he said

while in charge of the vessel in reporting to the charterer what had become of the cargo, and why he had not delivered it at Miami, was in the line of his duty and within his agency for the owners, dum fervebat opus. It is admissible evidence. 31 C.J.S., Evidence, § 351, subsec. b; The Potomac, 8 Wall. 590, 19 L.Ed. 511; The Rosalie M., 5 Cir., 12 F.2d 970; The Jos. J. Hock, 2 Cir., 70 F.2d 259. The judge called it "not strong", though he included in his findings of fact that the compass was faulty. It would be natural for the master to try to shift the blame from himself to the compass. The Chief Engineer, no longer an employee of the vessel, testifies that it was dark, the rocks were submerged, the master on the bridge, and a sailor acting as lookout when the stranding occurred in leaving the harbor of Anse d'Hainault, where the last bananas had been loaded. The engineer also was on the bridge. He testifies that he was in a sense in charge of the compass, and would know if any repairs were made on it; that none were made at Port au Prince where the vessel was drydocked and repaired; that none were made at any other time, and the same compass was used after the stranding and on other voyages till he left the ship. We are of opinion that this unimpeached testimony is to be accepted in preference to the master's unsworn statement, and that the compass was not faulty. In this respect only is it contended that there was unseaworthiness of the vessel.

We agree with the district judge that a negligent stranding appears. It is not claimed that the rocks were uncharted, or that any stress of weather existed. The prompt discharge of the master, who had long served as such, argues that it was then recognized to be his fault. The loss of the bananas was due to the stranding, both of those jettisoned in order to float the vessel and those returned to the seller at Anse d'Hainault. This was a village of six hundred natives, with no market for bananas there, and apparently no other shipping available. The bananas would have perished in a few days by over-ripeness. The Monarch of Nassau proceeded to Port au Prince for repairs, which kept her there over six weeks.

We agree with the district judge that the Harter Act, 46 U.S.C.A. §§ 190–195, does not apply directly, since the charter is of the entire ship to haul bananas

from Haiti to Miami for M. Levin and Co. The vessel in this service is not a common carrier, but a private contract carrier. Koppers Connecticut Coke Co. v. James McWilliams Blue Line, 2 Cir., 89 F.2d 865; The Westmoreland, 2 Cir., 86 F.2d 96; The G. R. Crowe, 2 Cir., 294 F. 506; The Fri, 2 Cir., 154 F. 333. Nor does this charter adopt the Harter Act, as did the one in The Framlington Court, 5 Cir., 69 F.2d 300, decided by this court. These cases all declare that in such private carriage the parties may contract pretty much as they please, especially if a seaworthy vessel is furnished. The parties to this charter agree that Levin shall pay $5,000 in advance for each voyage from Haiti, to be considered as earned when the vessel reports for loading and not to be returned if ship and/or cargo is lost after leaving port; that 48 hours shall be allowed for loading and unloading, and demurrage thereafter shall be paid at $400 per day. Par. 5 reads thus: "In the event that the motor vessel Monarch of Nassau, while en route to Miami, Florida, with cargo, is required to put into another port for repairs for longer than 48 hours the vessel and owners shall not be liable for any loss or damage to the cargo then on board the vessel, but in such event the freight money shall not be considered earned for that voyage until the ship returns to a port or ports in Haiti and another cargo is loaded." Par. 9 is: "The agents or owners of the motor vessel Monarch of Nassau will not be responsible for whatever condition the fruit arrives in Miami caused by any delay or otherwise." Par. 9 does not apply, because the fruit never arrived in Miami. But it and the other provisions referred to show how acutely aware the parties were that they were dealing with a very perishable cargo. Because the bananas would spoil speedily, a lien on them was of little value, so pay in advance was agreed on. Their condition on arrival was so likely to be bad that delay or other cause was not to make the ship liable. Paragraph 5 says in effect, If en route a delay of more than 48 hours is required for repairs, the ship shall lose its $5,000 advance freight, and the charterer will probably lose his investment of about the same amount in the cargo, and the ship will also lose the time necessary for the repairs. In the present instance the ship tried to save the cargo by redelivering it to the sellers, but in vain. It lost six weeks time, amounting at $400 per day to $16,800, besides its prepaid freight of $5,000.

The reason urged for not applying Par. 5 is that the stranding was due to the master's negligence, and if the contract be construed to apply in a case of negligence it would be contrary to public policy; and at least it should not be construed as so meant by the parties. The public policy to be considered in enforcing in a court at Miami a contract made there is that of the United States. That policy as to common carriers by water is expressed in the Harter Act. It appears also as to all vessels in the Limitation of Liability statute, 46 U.S.C.A. § 183. In the latter the fault or privity of the owner or agent defeats the relief, but not the negligence or misconduct of the master and crew, who may however, be held personally liable under § 187. In the Harter Act, stipulations in bills of lading against liability for negligence are prohibited as to the loading, stowage, care and delivery of goods, or in equipping and manning the vessel so as to make her seaworthy; but by Section 3, 46 U.S.C.A. § 192, in words really broad enough to include private as well as common carriers, it is provided that when owners or charterers have exercised diligence to make her seaworthy, neither they nor the vessel shall be held responsible for damage or loss resulting from errors in navigation or in the management of the vessel. In The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241, a British vessel was chartered for a voyage from Matanzas to Philadelphia with no mention of the Harter Act enacted the year before. The court treated the case as governed by the Act, and holding the vessel seaworthy at the commencement of the voyage held also that negligence in not closing the portholes securely did not create liability. In the Second Circuit, whose decisions we cited above, it is now held that the Act is not applicable to a chartered vessel, but still it states the public policy of the United States in cases not within the Act. The Edith, 2 Cir., 10 F.2d 684. A negligent stranding is an error in navigation and in the management of the vessel. The Oritani, D.C., 40 F.2d 522, affirmed 3 Cir., 54 F.2d 1075. See also Luria Bros. & Co. v. Eastern Transport Co., 2 Cir., 89 F.2d 900; The Jason, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969. We see nothing contrary to the public policy of the United States in enforcing Par. 5 in a case of negligent strand-

ing. We think the words of this paragraph clearly cover all cases of necessary delay for repairs en route exceeding 48 hours, the repairs not being occasioned by unseaworthiness at the commencement of the voyage.

The judgment is reversed and the libel is dismissed with costs against the libellant.